IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

NANCY E. LEROUX,                  )
                                  )
            Plaintiff,            )          8:06CV247
                                  )
        v.                        )
                                  )
SOCIAL SECURITY                   )     MEMORANDUM AND ORDER
ADMINISTRATION,                   )
                                  )
            Defendant.            )
                                  )

     Pursuant to the parties' consent, this case is pending
before me for final disposition.  The plaintiff, Nancy E. LeRoux
("LeRoux") has appealed the decision of the defendant, the
Commissioner of the Social Security Administration
("Commissioner"), denying her request for social security
disability insurance benefits.  After carefully reviewing the
record, I find that the Commissioner's decision should be
remanded for reevaluation and/or clarification of the ALJ's
disability findings and her ability to return to past work or
other jobs in the market.

I.   PROCEDURAL BACKGROUND

     LeRoux applied for social security disability benefits on
September 12, 2003.  LeRoux has degenerative bone disease, a
cervical disc herniation with radicular pain, and severe
headaches which allegedly rendered her disabled as of August 1,
2003.  AR 59-61, 82-90, 307, 311.  Her application for disability
benefits was denied initially on October 16, 2003, (AR 288-91),
and upon reconsideration on February 26, 2004.  AR 293-97.

LeRoux filed a hearing request on April 4, 2004, (AR 43), and the hearing was held before an Administrative Law Judge ("ALJ") in Omaha, Nebraska on February 22, 2005. Testimony was received from LeRoux and a vocational expert who appeared at the ALJ's request. AR 43, 47-51, 300. The ALJ's adverse decision was issued on July 16, 2005, (AR 12-25), and LeRoux's request for review by the Appeals Council was denied on January 12, 2006. AR 5-9. LeRoux's pending complaint requesting judicial review and reversal of the Commissioner's decision was timely filed on March 6, 2006. Filing 1 (Complaint).

## II.   THE ALJ'S DECISION.

The ALJ's decision evaluated LeRoux's claims through all five steps of the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920. AR 12-23. The ALJ made the following findings:

1.   LeRoux met the special earnings requirements under Title II of the Social Security Act on August 1, 2003, and she continues to meet them;

2.   LeRoux has not engaged in substantial gainful activity since August 1, 2003.

3.   The record establishes that LeRoux has degenerative cervical disc disease and headaches, which are medically determinable impairments that have imposed more than slight limitations upon her ability to function;

4.   LeRoux's medically determinable impairments, either singly or collectively, impose some limitations upon her ability to perform basic work-related functions but have not revealed the same or equivalent attendant medical findings as are recited in Appendix 1 to Subpart P of the Social Security Administrations' Regulation No. 4;

2

5.   Despite the limitations caused by her medically
determinable impairments, LeRoux is able to perform her
past relevant work as an administrative assistant,
vocational program manager, facility supervisor, and
cashier;

6.   To the extent she attempted to establish total
disability through hearing testimony, LeRoux was not
credible;

7.   LeRoux is not disabled, as that term is defined under
the Social Security Act;

8.   LeRoux is not entitled to a period of disability or to
the payment of disability insurance benefits under
Title II of the Social Security Act;

9.   LeRoux is not eligible for the payment of supplemental
security income benefits under Title XVI of the Social
Security Act.

AR 23-24.


III.   ISSUES RAISED FOR JUDICIAL REVIEW.


LeRoux's complaint requests judicial review of this
decision.  She raises the following arguments in support of her
claim for reversal of the Commissioner's determination:


•   The ALJ improperly and inaccurately used the findings
of LeRoux's treating chiropractor, Dr. Dan Kjeldgaard,
to undermine the weight and credibility of the opinions
of her treating neurologist, Dr. Vashail Vora.  The ALJ
therefore failed to give "good reasons" for discounting
Dr. Vora's opinions, and since there was no other
evidence from an examining medical doctor, the ALJ's
decision was not supported by substantial medical
evidence.

•   The ALJ failed to acknowledge Dr. Kjeldgaard as a
medical source, failed to consider his opinions
according to the regulatory framework, and never
explained his "good reasons" for discrediting the
chiropractor's opinions.

3

- The ALJ failed to place specific and concrete
  restrictions on LeRoux's ability to use her neck, arms,
  and hands.  Since the hypothetical question posed to
  the vocational expert was based upon an inaccurate and
  vague residual functional capacity assessment, the
  expert's testimony cannot be considered sufficient
  evidence that LeRoux is able to engage in substantial
  gainful employment.

Filing 10 (Claimant's brief).

In response, the Commissioner argues the ALJ's assessment of
LeRoux's residual functional capacity was based on his conclusion
that the LeRoux's subjective complaints of pain and disability
were not credible.  The Commissioner claims the ALJ's credibility
finding, and therefore his residual functional capacity findings,
must be affirmed because he properly and thoroughly outlined the
reasons for discounting LeRoux's credibility, and these reasons
are fully supported by the record.  Filing 13 (Commissioner's
brief).

IV.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

At the time of her hearing, LeRoux was forty-nine years old.
She had received her GED and attended one and a half years of
college.  She was able to read, write, and speak English, and was
able to handle her own finances.  AR 303-04.  She had not worked
since August 1, 2003, the date she began receiving short-term
disability benefits through her employer.  In October 2003, she
began receiving $1314 per month under a long-term disability
policy provided through her employment.  AR 303.

At the time she was placed on disability, LeRoux was
employed as a facility supervisor in a human services (group

4

home) setting.  Her prior work history dated back to at least 1989 and included employment as a factory worker, retail cashier, administrative assistant, and vocational program manager.  AR 83, 175.

LeRoux's medical records establish that she initially complained of neck pain to her primary care physician, Dr. Virginia Aguilar, on February 10, 2003.  She stated her neck had been stiff for two months and the symptoms were radiating to her back.  Dr. Aguilar's diagnosis was cervical muscle strain.  The doctor prescribed Naprosyn (an anti-inflammatory) and Skelaxin (a muscle relaxant and pain reliever), and she told LeRoux to call and return for a follow up appointment if her condition did not improve with these medications.  AR 181-82.  LeRoux saw the doctor on February 18, 2003 and complained of cold symptoms, but there is nothing in the record mentioning complaints of neck pain and stiffness.  AR 179-80.

When LeRoux saw Dr. Aguilar on April 1, 2003 to receive a B-12 shot,[1] she complained of neck stiffness and pain radiating to her left shoulder.  She denied having numbness or weakness.  Dr. Aguilar's diagnosis was cervical strain with left-sided radiculopathy, and she prescribed physical therapy two times a week for six weeks.  AR 177-78.

---

[1]LeRoux has a history of pernicious anemia, (AR 242) a chronic anemia caused by impaired or inadequate absorption of vitamin B-12 and treated with periodic B-12 (cyanocobalamin or hydroxocobalamin) injections.  See eMedicine from WebMD, Pernicious Anemia, http://www.emedicine.com/med/topic1799.htm (updated October 4, 2006).  There is no evidence that pernicious anemia contributed in any way to LeRoux's alleged disability.

LeRoux's physical therapy began on April 3, 2003 and
continued through May 27, 2003.  AR 149-76.  On initial
examination, LeRoux told the physical therapist that her pain
began 7-8 months earlier.  She complained of pain on the left
side of her neck and into her left shoulder.  Objective findings
included reversed cervical lordosis, bilaterally protracted
shoulders, and left scapular winging.  An MRI scan performed on
April 14, 2003 revealed kyphosis of the cervical spine,
degenerative disc disease with disc herniations at C5-6, C6-7,
and C7-T1.

In early April 2003, LeRoux was in the process of moving to
a different residence.  Her left shoulder pain starting radiating
into her left arm during that time period, (AR 172), and on April
15, 2003, she reported to her physical therapist that her pain
symptoms were worsening, pain was radiating into her left arm,
and her vision was blurring.  AR 168.  The physical therapist
recommended that she return to her treating physician.  AR 168.
On April 17, 2003, LeRoux began complaining of pain in her right
shoulder as well.  AR 167.

Dr. Aguilar ordered a repeat MRI, which was performed on
April 23, 2003.  This second MRI showed a slight increase in the
kyphosis of the cervical spine, (AR 170), and like the previous
MRI, disclosed the following spinal abnormalities from the C2
through the T1 level of LeRoux's cervical spine.

> There is mild gentle kyphosis from C4 to C7.  There is
> very mild step deformity.  The C2-3 disc space is
> severely narrowed with mild marginal osteophyte
> formation.  C3-4, C4-5, C5-6 and C6-7 disc spaces are
> also narrowed, with marginal osteophytes from C4 to C7.
> A focal sclerosis is present inferolaterally and
> posteriorly in C5 and on either side of the C6-7 disc

6

space posteriorly and on the left, Normal appearance of
the foramen magnum.

No significant disc herniations at C2-3 and C3-4 disc
spaces.  There is a mild pseudoherniation centrally at
C4-5 due to the step deformity.

At the C5-6 disc level there is a mild narrowing of the
right intervertebral foramen due to marginal osteophyte
formation.  Ossification of posterior longitudinal
ligament is present from C5-6 to C7-T1 disc level.
There is a large fusiform disc herniation at the C6-7
disc level with left foraminal extension and
concomitant narrowing of the left C6-7 foramen.
Marginal osteophyte and focal sclerosis is present
around the foramen.  There is mild cord compression at
the C6-7 disc level with no definite evidence of focal
myelomalacia.  Vertebral endplate changes are also
present at the C6-7 disc level.

At the C7-T1 disc level there is very mild central
noncompressive disc herniation.  There is mild
narrowing of the left C7-T1.

AR 163.

Physical therapy continued.  As of May 6, 2003, the physical
therapist reported that LeRoux "comes to therapy with minimal
complaints of pain at this time.  She has no improvement or
worsening of her condition."  AR 158.

LeRoux saw her treating neurologist, Yashail Vora, for the
first time on May 9, 2003.  LeRoux complained of left arm pain
and pain in the trapezius region bilaterally, but she "appear[ed]
healthy and in no distress."  Dr. Vora examined LeRoux, reviewed
her MRI report and diagnosed LeRoux as having a radiculopathy
secondary to the impingement of the left C7 nerve root due to
foraminal stenosis and disc herniation.  He prescribed cervical
traction through physical therapy for LeRoux's cervical

spondylolisthesis, and was scheduled to see her again in one
month.  AR 242-43.

The cervical traction therapy began on May 13, 2003, (AR
157), and continued until May 27, 2003.  On May 16, 2003, she
reported feeling less pressure through the day, but stated
carrying a notebook from the house to the car exacerbated her
discomfort.  As of May 27, 2003, LeRoux reported that her pain
was feeling better; however, it remained painful to bend her neck
sideways on either side or look up to the ceiling.  AR 152.
LeRoux came to physical therapy on June 3, 2003, but was not
treated because the traction machine was occupied by another
patient.  She cancelled her June 5, 2003 appointment.

LeRoux saw Dr. Vora again on June 12, 2003, and stated she
has not significantly improved and had new symptoms in her left
upper extremity and right arm.  Her fiancé stated she was taking
a bottle of Excedrine Migraine every three days.  Dr. Vora
prescribed cervical epidural injections.  AR 241.  The injections
were attempted, but were not completed because LeRoux could not
tolerate the procedure.  AR 240.

On June 23, 2003, LeRoux saw her physical therapist in the
hospital hallway and "reported her physician said to discontinue
therapy as the traction appeared to be causing her more
discomfort."  AR 149.  She was therefore discharged as a physical
therapy patient on June 24, 2003.  AR 149.  On July 2, 2003,
LeRoux saw her treating chiropractor, Dr. Dan C Kjeldgaard, and
stated the physical therapy made her symptoms worse, describing a
two-month history of right arm pain after going to physical
therapy.  She did not describe or diagram left arm pain.  AR 222.

Dr. Kjeldgaard examined LeRoux on July 2, 2003, and on July 7, 2003, completed a Treatment and Work Restriction Report outlining the following physical restrictions on her ability to work:

- No work using her right or left arm or hand for grasping, pushing, or pulling or fine manipulation, and no repetitive action for more than 20 minutes;

- No pushing, carrying, or lifting more than 25 pounds;

- No frequent or continuous bending or stooping;

- Restrict exposure to manual labor with arms.

AR 221.  Dr. Kjeldgaard did not, however, begin treating LeRoux until July 29, 2003.  AR 213.

On July 17, 2003, LeRoux saw Dr. Vora and reported her left arm pain had significantly improved to the point that she was currently experiencing little pain.  Most of her discomfort was reportedly in her neck.  She did not describe right arm pain or symptoms.  Dr. Vora prescribed a Lidoderm patch and physical therapy for massage, treatment, and myofascial release, and gave her a soft cervical collar to use.  LeRoux never returned to physical therapy, and never used the prescribed Lidoderm patch or soft collar.  AR 239.

On July 29, 2003, Dr. Kjeldgaard clarified his prior Treatment and Work Restriction Report with respect to LeRoux's use of her upper extremities.  Specifically, Dr. Kjeldgaard stated LeRoux could use her right or left arm or hand for grasping, pushing, or pulling or fine manipulation if the work was not strenuous and the activity did not aggravate her

9

symptoms.  AR 219.  LeRoux received chiropractic treatment on July 30, 2003, and four or five days a week thereafter until September 24, 2003.  Her disability claim, filed on September 12, 2003, identified her date of onset as August 1, 2003.  AR 59-61, 82-90, 307, 311.

By the time of LeRoux's next appointment with Dr. Vora on August 20, 2003, she had received 15 chiropractic treatments from Dr. Kjeldgaard.  AR 228-29.  She told Dr. Vora she was "much improved with chiropractic manipulation," and "denie[d] any significant pain. . . ."  She reported no neurological symptoms in her left arm, and was "actually quite content with her progress and wished to have paperwork filled out for work disability."  The doctor believed "she should be able to return to work in about four weeks if she remains stable as she is at this time."  AR 239.  Followup was scheduled on an as-needed basis.  AR 239.  Other than aspirin, no pain medication was prescribed.  AR 236, 321-22.

LeRoux's last chiropractic examination occurred on September 24, 2003.  Her post-treatment reexamination performed on October 9, 2003 showed improvement in her cervical kyphosis and "a vast improvement in symptoms, with no pain at times."  AR 213.  Her "prognosis for the short term is good, without heavy exertion or work with her head in a flexed position."  AR 213.

A residual functional capacity (RFC) assessment was performed on October 15, 2003.  The RFC stated LeRoux could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and stand, walk, or sit about 6 hours in an 8-hour day.  No other restrictions were placed on LeRoux's activities. 203-211.  The RFC addendum states:

10

The claimant's allegations are partially credible.  She
states that she has significant limitation of ADL due
to pain symptoms, however, she reported to her TS that
she was much improved.  On the ADL report, she stated
that she had symptoms in both arms and numbness of the
hands, which is not supported by the records of her
doctor.  The evidence does not support any limitations
in her ability to walk, stand, or sit, as alleged.  Her
allegations as reported on the ADL report and
application are inconsistent with the records of her
treating sources, [who] indicate that she currently is
much improved and denied significant pain.  At present
time, she appears capable of lifting 20# occasionally,
10# frequently.  There are no limitations in walking,
standing, or sitting.  There are no other limitations
supported by the evidence.

AR 211-12.


Thereafter, LeRoux attended followup appointments with Dr.
Vora about every three months, and particularly when additional
disability or Medicaid applications needed to be completed and
signed by a doctor.  Though she claims her symptoms have gotten
worse with time, she has received no pain, anti-inflammatory, or
muscle relaxant prescription medications from Dr. Vora for her
cervical neck symptoms.  AR 233-261, 322-23.  She was repeatedly
told to stop smoking to slow the progression of her symptoms, and
to use the soft cervical collar, but she failed to do so.  AR
234, 237-38, 248, 250-257, 259, 261, 322.  Surgery was
recommended, but LeRoux declined.  AR 233, 237-38, 253, 313.
LeRoux also sees Dr. Aguilar regularly for treatment of other
disorders, (AR 263-80), and has occasionally complained of neck
pain, (AR 268, 270, 273, 280), but Dr. Aguilar has not prescribed
any pain medications or other treatment modalities.


Though the severe headaches she described at the February
12, 2005 hearing began seven months earlier, (AR 307, 311, 320),
and LeRoux was seen on several occasions by Dr. Vora, (AR 250,

252, 253, 261), and Dr. Aguilar, (AR 263-265, 267, 277, 280),
during that time frame, LeRoux never told Dr. Vora or Dr. Aguilar
that she was experiencing recurrent headaches, and never sought
treatment for that alleged condition.  AR 320-21.

      In a letter to plaintiff's counsel dated November 22, 2004,
Dr. Vora stated:

> [LeRoux] suffers from neck pain [and] numbness of her
> hands.  She demonstrates evidence of weakness as well.
> Any manual labor type of work such as regular bending
> and lifting, pushing or pulling, could result in
> exacerbation of her symptoms.  Any work involving
> frequent movement of the head and neck region on a
> regular basis could also result in worsening of her
> condition.  Due to numbness in her hands, any work that
> requires fine sensation of the hands would also be
> difficult to perform.

AR 261.

      At the hearing conducted less than three months later,
LeRoux testified that she is able to sleep only an average of
four hours a night, and sometimes not at all.  She stated she
cannot sit or stand for more than a half hour, lies down three
times a day for up to three hours at a time, and she would be
unable to alternate between sitting and standing during the work
day and, with normal breaks, tolerate an eight-hour work day.
She claims walking around the block tires her out.  She testified
that on a good day, she can lift no more than 10 pounds; on a bad
day, she cannot lift a glass of water.  AR 315.  She also claimed
her ability to grip or grasp was diminished due to numbness in
her hands.  AR 315-16.

      LeRoux testified that she can cook and do dishes, but cannot
open jars or scrub pans.  She can do light grocery shopping,

light housework, and the laundry if she does not have to lift
anything heavy (milk, laundry detergent, kitty litter).  She
testified that she can scoop out the litter box, but cannot
vacuum, garden, mow, or shovel, and she can watch movies at home
so long as she alternates between sitting and lying down.  LeRoux
claims she can play pool daily for 2-3 hours at a time, but
cannot read for long periods with her head in one position.  AR
316-319.

The ALJ asked the vocational expert to assume someone with
LeRoux's age, education and work experience could lift up to 20
pounds occasionally and 10 pounds frequently, and could sit or
stand for six hours and day and, with normal breaks, complete an
eight hour day, but could not push or pull the weight limit of 20
pounds, do frequent bending or stooping, or perform heavy manual
labor (defined as repetitive or constant use) with her arms.
Assuming these restrictions, the VE testified LeRoux could
perform her past relevant work as an administrative assistant,
vocational program manager, cashier, and facility supervisor, but
she could not perform as a factory worker.  AR 324-25.  According
to the VE, such occupations are primarily in the light exertional
work category, and even if LeRoux were limited to lifting only 10
pounds occasionally and 5 pounds frequently, the occupational
base would be eroded, but jobs would remain.  AR 325-26.  The VE
testified that thousands of jobs exist for persons with LeRoux's
past work experience and education who are subject to the
physical restrictions posed by the ALJ.  AR 327-28.  However, no
jobs remain available in the regional or national economy if, as
LeRoux testified, her headaches require her to lie down two to
three times a day for up to three hours at a time.  AR 329.

13

The VE testified that if LeRoux's ability to bend, stoop, lift, push, pull, climb, and use her left or right arm or hand, is considered severely limited (incapable of minimal sedentary activity), she would be precluded from all competitive employment.  AR 332-33.  Supplement AR (filing 17), p 245A.


V.   ANALYSIS


Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision.  A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.  Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  Maresh v. Barnhart, 431 F.3d 1073, 1074 (8th Cir. 2005); Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2004)(quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome.  Id.  See also Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).


1.   Failing to Properly Evaluate and Rely on the Treating Physician's Opinions.

LeRoux claims the ALJ's disability finding and his hypothetical question posed to the VE were inconsistent with the opinions of Dr. Vora and Dr. Kjeldgaard.  As to Dr. Vora, the plaintiff claims the ALJ misinterpreted Dr. Vora's records,

14

erroneously used Dr. Kjeldgaard's records to undermine the weight
of Dr. Vora's opinions, and failed to properly defer to Dr.
Vora's opinions as a treating physician.  She argues that a
treating source's medical opinion is entitled to substantial
weight, the ALJ failed to give "good reasons" for discounting the
opinions of Dr. Vora, and there was no other evidence from an
examining medical source.  She therefore claims the ALJ's
decision was not supported by substantial medical evidence.

The regulations require "that the adjudicator will always
give good reasons in the notice of the determination or decision
for the weight given to a treating source's medical opinion(s),
i.e., an opinion(s) on the nature and severity of an individual's
impairment(s)."  SSR 96-2p, 1996 WL 374188 at *5.  Factors to be
considered are: (1) the length of the treatment relationship and
the frequency of examination; (2) the nature and extent of the
treatment relationship (such as the kinds and extent of
examinations and testing); (3) supportability of the opinion (the
more a source presents evidence such as medical signs and
laboratory findings, the more weight will be given that source's
opinion); (4) the consistency of the opinion with the record as a
whole; and (5) whether the physician is a specialist, as more
weight is given to the opinion of a specialist about medical
issues relating to the area of specialty than to the opinion of a
source who is not a specialist.  20 C.F.R. §§ 404.1527(d) and
416.927(d).  See also SSR 96-2p, 1996 WL 374188 at *4.

"A treating physician's opinion should not ordinarily be
disregarded and is entitled to substantial weight."  Singh v.
Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  If a treating
physician's opinion is well supported by medically acceptable
clinical techniques and is not inconsistent with the other

substantial evidence in the record, the opinion should be given
controlling weight.  Id.  Moreover, even if the ALJ concludes the
treating source's medical opinion is not entitled to controlling
weight, it may still be entitled to deference and be adopted by
the adjudicator.  SSR 96-2p, 1996 WL 374188 at *1 (S.S.A., July
2, 1996).  However, a treating physician's opinions must be
considered along with all the evidence, and when those opinions
are inconsistent or contrary to the medical evidence as a whole,
they are entitled to less weight.  Krogmeier v. Barnhart, 294
F.3d 1019, 1023 (8th Cir. 2002).

     The ALJ determined:

     [LeRoux] is able to lift up to 20 pounds occasionally
     and 10 pounds frequently; she can sit for 6 hours and
     stand for 6 hours and, with normal breaks, complete an
     8 hour work day; she should not push or pull the weight
     limit of 20 pounds; she should do no frequent bending
     or stooping; and she should not perform any type of
     repetitive or constant use of her arms for heavy manual
     labor.

AR 23.  This determination was a composite of the opinions of Dr.
Vora, Dr. Kjeldgaard, and the RFC considered in the context of
plaintiff's credibility (or lack thereof) and the totality of her
medical records.

     •    Dr. Vora's November 2004 letter stated LeRoux must
          avoid "manual labor" work, including work that required
          regular bending and lifting, and pushing or pulling,
          and should further avoid frequent movement of the head
          and neck region on a regular basis, but his April 2004
          attending physician's statement for waiver of LeRoux's
          disability policy premiums states LeRoux is incapable of
          even minimal bending, stooping, lifting, pushing or
          pulling, climbing, or use of her hands or arms.  Dr.
          Vora placed no restrictions on LeRoux's ability to
          stand and walk.  In February 2004, he reported to her
          disability insurer that she was unable to work, perhaps

16

permanently.  AR 261, Supplement AR (filing 17), p 245A;

- In July 2003, at the outset of providing chiropractic treatment, Dr. Kjeldgaard concluded LeRoux should not use her right or left arm or hand for grasping, pushing, or pulling or fine manipulation, perform repetitive action with her arms for more than 20 minutes, push, carry, or lift more than 25 pounds, engage in frequent or continuous bending or stooping, or perform manual labor with her arms.  After three weeks of chiropractic treatment, LeRoux was "much improved," "denie[d] any significant pain," was "quite content with her progress," and was likely able to return to work in four weeks.  Despite this self-reported improvement, LeRoux enlisted Dr. Vora's aid in filing an employment disability claim with her disability insurer.  AR 239.

- In October 2003, the RFC examiner concluded LeRoux could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and stand, walk, or sit about 6 hours in an 8-hour day.  No other restrictions were placed on her activities.  AR 203-211.

From these sources, the plaintiff's medical records, and her testimony, the ALJ concluded LeRoux could lift up to 20 pounds occasionally and 10 pounds frequently, but she should not frequently bend or stoop, and should not perform any type of repetitive or constant use of her arms for heavy manual labor.

The ALJ's determination is more specific, especially in terms of weight limits, but it is not necessarily inconsistent with Dr. Vora's November 2004 opinion.  Dr. Vora restricted the plaintiff from performing "manual labor work," and explained that "manual labor work" included work requiring regular bending, lifting, pushing, or pulling.  Though somewhat different terminology was used, these restrictions were nonetheless adopted by the ALJ and included in his hypothetical question to the VE.

17

The ALJ did refuse to consider Dr. Vora's February and April 2004 statements that LeRoux was unable to work.  These opinions were written in insurance forms completed by the doctor to secure LeRoux's disability benefits.  The ALJ did not consider Dr. Vora's conclusion that LeRoux was unable to work because while a "claimant's residual functional capacity is a medical question," Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 001)), stating that a claimant cannot work is not a medical opinion.  Rather, it is an opinion on the application of the statute, a task that is assigned solely to the discretion of the Commissioner.  See Brosnahan v. Barnhart, 336 F.3d 671, 676 (8th Cir. 2003) (ALJ properly discounted psychologist's opinion that claimant could not work); Kroqmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) (psychiatrist's opinion that claimant could not be gainfully employed was not a medical opinion); Flynn v. Chater, 107 F.3d 617, 622 (8th Cir. 1997)(physician's opinion that claimant "may not be able to work in a competitive employment situation" not given weight).

The ALJ also rejected Dr. Vora's April 2004 statement to LeRoux's insurer that LeRoux is incapable of even minimal bending, stooping, lifting, pushing or pulling, climbing, or use of her hands or arms as inconsistent with his medical records and his treatment of the plaintiff.  AR 22.  Specifically, the ALJ noted that as of the plaintiff's alleged social security disability onset and at the time she was applying for disability insurance benefits, she was also reporting to her chiropractor and Dr. Vora that she was substantially improved through chiropractic care.  Though she claims Dr. Kjeldgaard's July 2003 records indicating LeRoux had improved and could likely return to work in four weeks should not be used to challenge the strength of Dr. Vora's opinions, considered in the totality, the record

18

reveals the plaintiff began to seek social security and insurance disability benefits with the help of Dr. Vora while reporting she was substantially improved.  Interpreted on the record as a whole, such conduct undermines both LeRoux's credibility and the veracity of Dr. Vora's opinions.  Since any determination of plaintiff's RFC rests in large part on her credibility in reporting subjective symptoms of pain and weakness, the ALJ properly considered Dr. Kjeldgaard's records in interpreting the weight to be given to Dr. Vora's functional capacity opinions.

In addition, although Dr. Vora told the insurer in April 2004 that LeRoux was incapable of working, in May 2004, LeRoux was reporting improvement in her arm numbness, paresthesias, and weakness, and had 5/5 strength in both upper extremities including hand grip.  AR 22, 248.  These findings in the medical records do not appear consistent with total disability.  The court further notes that LeRoux was not taking prescription-only medications, saw Dr. Vora on an "as-needed" basis only, refused recommended surgery, failed to quit smoking despite numerous recommendations, and saw Dr. Vora only "as needed" to keep her disability paperwork current.  To the extent that the ALJ refused to accept Dr. Vora's conclusion that LeRoux could not perform even minimal bending, stooping, lifting, pushing or pulling, climbing, or use of her hands or arms, I conclude the ALJ provided adequate "good reasons" for disregarding this opinion. I further conclude that in addition to the specific reasons cited by ALJ, the record as a whole reflects Dr. Vora's disability statements made to the insurer on LeRoux's behalf are far more restrictive than those contained in or supported by his medical records.

19

I therefore conclude the ALJ's determination is not subject to reversal for failing to give substantial weight to the opinion of the treating physician, Dr. Vora, or to adequately explain why such weight was not given.

    2.    <u>Failing to Properly Evaluate and Rely on the Chiroprator's Opinions.</u>

The plaintiff claims the ALJ failed to properly recognize "Dr. Kjeldgaard as any type of medical source.  The ALJ never attempted to evaluate Dr. Kjeldgaard's opinions under the regulations and never gave good reasons for discrediting those opinions."  The plaintiff claims this error requires reversal.

A chiropractor is not considered an acceptable source of medical evidence to prove disability; such evidence may only be used to show how an impairment affects the claimant's ability to work.  See <u>Cronkhite v. Sullivan</u>, 935 F.2d 133, 134 (8th Cir.1991)(citing 20 CFR 404.1513(a) and (e)); <u>Kelley v. Massanari</u>, 18 Fed. Appx. 453, 454, 2001 WL 1040019, *1 (8th Cir. 2001); <u>Burdette v. Apfel</u>, 2000 WL 1371110, *1 (8th Cir. 2000). The ALJ did not err in failing to consider Dr. Kjeldgaard as an "acceptable medical source" for assessing LeRoux's alleged disability, and did not err by failing to evaluate or afford controlling weight to his opinions.

    3.    <u>Failing to Place Specific and Concrete Restrictions on Ms. Leroux's Ability to Use Her Neck, Arms, and Hands.</u>

LeRoux claims the ALJ erred in relying on an incomplete and imprecise hypothetical question to the vocational expert.  For a vocational expert's opinion to be relevant, an ALJ must accurately characterize a claimant's medical conditions in

hypothetical questions posed to the vocational expert.  Harvey v.
Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004).  The hypothetical
must include all impairments that are supported by substantial
evidence in the record as a whole.  Tucker v. Barnhart, 363 F.3d
781, 784 (8th Cir. 2004).  Likewise, the ALJ may exclude any
alleged impairments that she has properly rejected as untrue or
unsubstantiated.  Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir.
2001).  "[T]he hypothetical is sufficient if it sets forth the
impairments which are accepted as true by the ALJ."  Harvey, 368
F.3d at 1017 (quoting Roberts v. Heckler, 783 F.2d 110, 112
(8th Cir. 1985)).

The ALJ asked the vocational expert to assume "we have
someone such as the claimant of the same age, education and past
work history, both as to exertional as well as skill level, and
possessing any of the transferrable skills which may be in the
record for the type of work she was performing," and this person
can "lift up to 20 pounds on occasion, 10 pounds on a frequent
basis, could sit for six hours and stand for 6 hours, and with
normal breaks complete an 8 hour work day," but cannot push or
pull the weight limit of 20 pounds, frequently bend or stoop, or
perform heavy manual labor with her arms.  The heavy manual labor
restriction was defined to mean the person cannot repetitively or
constantly use the arms for lifting.  AR 324-25.  However,
neither "repetitive" nor "constant" use of the arms was defined
or clarified in any way.

In Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000), the
Eighth Circuit reversed an ALJ decision where the ALJ found the
claimant's impaired hand function "limited her to lifting ten
pounds frequently with occasional lifting of up to twenty pounds
and that she 'must not perform repetitive activity with her

21

hands.'" <u>Id</u>. at 972.  Since the ALJ failed to define
"repetitive," or adequately examine the specific duties of the
claimant's prior positions to determine whether they required
"repetitive" use of the hands, the ALJ's decision was remanded
for further findings.  <u>Id</u>. at 972-73.

As in <u>Lowe</u>, the ALJ failed to sufficiently clarify the
meaning of "heavy manual labor;" that being "repetitive" or
"constant" use of the arms for lifting, and he made no attempt to
assess the extent to which arms are used in performing LeRoux's
past relevant positions as an administrative assistant,
vocational program manager, cashier, or facility supervisor.  I
therefore conclude the ALJ's hypothetical question was not
sufficiently explicit.

CONCLUSION

The hypothetical question posited to the vocational expert
did not include a sufficiently explicit listing of LeRoux's
physical limitations, and therefore the vocational expert's
testimony cannot be relied upon in denying LeRoux's request for
Social Security benefits.  On remand the ALJ should reevaluate
and/or clarify LeRoux's RFC and, assuming that testimony is again
solicited from a vocational expert, conform any hypothetical
questions to the new and/or more specific RFC determination.

IT THEREFORE HEREBY IS ORDERED:  Judgment shall be entered
by separate document providing that the final decision of the
Commissioner is reversed and the cause remanded for further
proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 1st day of December, 2006.

BY THE COURT:

s/ *David L. Piester*

David L. Piester
United States Magistrate Judge

22